# United States Court of Federal Claims

No. 10-751 C
(Filed Under Seal:  January 9, 2012)
(Reissued:  March 30, 2012)[*]
UNPUBLISHED

| | |
|---|---|
| **Carlos A. Diaz-Laboy,** | |
| *Plaintiff*, | RCFC  52.1;  Military  disability pay;  10 U.S.C.  § 1201;  Military Pay Act; Arbitrary and capricious; Substantial evidence |
| **v.** | |
| **United States of America,** | |
| *Defendant.* | |

Michael D.J. Eisenberg, Law Office of Michael D.J. Eisenberg, Washington, DC, for plaintiff.

Kimberly I. Kennedy, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**Block,** *Judge.*

Before the court are the parties' cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").  Plaintiff Carlos A. Diaz-Laboy was discharged from the United States Air Force on May 29, 2009, with a disability rating of 10 percent, entitling him to severance pay.  Administrative Record ("AR") at 6; Compl. at 2.  Plaintiff contests this determination.  In particular, plaintiff alleges that the Air Force erred by rating plaintiff's stenosis too low on its scale and by not convening a new medical evaluation board to evaluate numerous conditions and symptoms.

In adjudicating this case it is worth reiterating that the court does not render a decision *de novo*.  To be sure, the court does not determine who is right and who is wrong.  It may not make an independent factual assessment of medical evaluations.  Instead, the role of the Court of Federal Claims in these military medical disability cases is to serve as a check on irrational or arbitrary government conduct.  It provides this check by reviewing determinations of applicable government agencies as found in the record on the traditional "arbitrary and capricious" standard of review.[1]  This heightened standard is intended to provide fairness to both the private litigant

---

[*] This opinion originally was issued under seal on January 9, 2012.  The court afforded the parties an opportunity to propose redactions in the opinion prior to its reissue.  For the reasons set forth the in Appendix, the court rejects plaintiff's proposed redactions.  The opinion is herein reissued, unsealed.

[1] This standard, lifted from the Administrative Procedure Act, 5 U.S.C. § 706, requires deferential review.  As the Supreme Court recently explained, "Under what we have called this 'narrow' standard of review . . . [w]e have made clear . . . that a court is not to substitute its

and the agency charged with the public good by assuring judicial deference to agency expertise sorely lacking in a court of law yet safeguarding the individual from often despotic governmental conduct.  Applying this deferential standard to this case, the court must conclude, for the reasons stated below, that the Air Force's decision was neither arbitrary, nor capricious, nor unsupported by substantial evidence.  Accordingly, plaintiff's motion must be denied, and defendant's motion must be granted.

## STATUTORY AND REGULATORY BACKGROUND

The secretary of each of the armed forces has been authorized since 1956 to retire or discharge with severance pay service members who are unfit to perform their military duties because of physical disability.  10 U.S.C. §§ 1201–1222.  The Secretary of the Air Force has issued a number of regulations implementing these statutes.  *See, e.g.*, Air Force Instruction ("AFI") 36-3212; AFI 41-210; AFI 48-123.  These regulations establish the Air Force's Disability Evaluation System ("DES"), which is the process for determining whether service members are physically unfit for service.  *See* AFI 36-3212 ¶ 1.1.  That process entails review by (1) a medical evaluation board, (2) two physical evaluation boards, one informal the other formal (see below), and (3) the Secretary of the Air Force Personnel Council.

A medical evaluation board ("MEB")—the "first step" in the Air Force DES—consists of three physicians appointed by the commander of the local Medical Treatment Facility ("MTF").  AFI 41-210, ¶¶ 10.1, 10.2.1-.2.  After an attending physician examines the service member and documents any medical defects or conditions that may disqualify the service member from continued military service, the MEB examines the documentation and recommends either that the service member be returned to active duty or that the member be referred to an informal physical evaluation board.  AFI 36-3212, ¶ 2.2; AFI 41-210, ¶ 10.7.3.  If the latter, the MEB forwards its medical evaluation report and a narrative summary to an informal physical evaluation board.  AFI 41-210, ¶ 10.7.3.

As already mentioned, an informal physical evaluation board is one of two physical evaluation boards.  A physical evaluation board ("PEB")  is a fact-finding body consisting of three officers (at least one of whom is a physician) tasked with investigating the nature, origin, degree of impairment, and probable permanence of the service member's physical or mental condition.  AFI 36-3212, ¶¶ 3.1, 3.8.  The difference between the informal and formal PEBs is procedural.  The informal PEB offers the service member no hearing, but considers only medical and personnel records, as well as other appropriate documentation.  *Id.* ¶ 3.33.  If a service member found unfit disagrees with the informal PEB's findings, the service member may request a formal PEB.  *Id.* ¶ 3.39.1.  The formal PEB conducts a non-adversarial administrative proceeding in which the service member recommended for discharge or retirement has the opportunity to appear in person, to be represented by counsel, and to present evidence and call witnesses.[2]  *Id.* ¶ 3.38.

---

judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *F.C.C. v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) (internal quotations and citations omitted).

[2] Notably, the formal PEB provides the "full and fair hearing" required by 10 U.S.C. § 1214.  AFI 36-3212, ¶ 3.2.

Upon finding a service member unfit, a PEB recommends an appropriate disposition, including discharge with severance pay (referred to in 10 U.S.C. § 1203 as "separation") or retirement. *Id.* ¶ 3.29. Whether the PEB recommends separation or retirement depends upon how high the PEB rates the service member's degree of impairment. In rating degree of impairment, the PEB uses the Department of Veterans Affairs Schedule for Rating Disabilities (the "rating schedule"). *Id.* ¶ 1.7. The rating schedule consists of four-digit codes, each of which is matched with particular conditions or categories of conditions. *See, e.g.*, 38 C.F.R. § 4.124a (listing codes for rating neurological conditions and convulsive disorders). Using these codes, the PEB rates any condition rendering the service member unfit on a scale of 10 percent to 100 percent.[3] Importantly, a service member found unfit with a disability rating of at least 30 percent may be eligible for "retirement" under 10 U.S.C. § 1201 (with "retired pay" calculated under 10 U.S.C. § 1401), whereas a member with a disability rating of less than 30 percent can be eligible only for "separation" under 10 U.S.C. § 1203 (with "severance pay" calculated under 10 U.S.C. § 1212).

A service member who disagrees with the PEB's findings or recommendation may submit a rebuttal. AFI 36-3212 ¶ 5.4.1. Rebuttals are forwarded to the Secretary of the Air Force Personnel Council (the "Personnel Council"), *id.*, where they are reviewed by a board. *Id.* ¶ 5.5. That board, called the Air Force Personnel Board (the "Personnel Board"), has five voting members, at least one of whom must be in the Medical Corps. *Id.* ¶ 5.6. Although the service member and counsel may not appear before the Personnel Board uninvited, the Personnel Board considers all records evaluated by the physical evaluation board, records of the physical evaluation board hearings, the service member's rebuttal, and any additional documents submitted by the member or requested by Personnel Council. *Id.* ¶ 5.8. The Personnel Board is authorized to change any of the physical evaluation board's findings or recommendations, but must explain the reasons for any such change. *Id.* In the end, the Personnel Board recommends final disposition to Personnel Council. *Id.*

After receiving a recommendation from the Personnel Board, the Secretary of the Air Force Personnel Council can defer a decision pending receipt of additional records, direct the Personnel Council to resubmit the case after taking certain specific actions, return the member to duty, or discharge or retire the member. *See id.* ¶ 5.9. Thereafter, the member can appeal to the Air Force Board for Correction of Military Records (the "board of corrections") for correction of any error or injustice.

**FACTUAL BACKGROUND**

Plaintiff joined the Air Force on May 28, 2005, and served as a dentist at Edwards Air Force Base in California. AR at 17–19. On September 26, 2007, a medical evaluation board convened to consider plaintiff's fitness for service. *See id.* at 194. The MEB determined that plaintiff suffered from diabetes mellitus, a condition that could potentially render plaintiff unfit for military service. *See* AFI 48-123, ¶ 5.3.16.5. Although the administrative record indicates

---

[3] The percentage must be a multiple of ten (i.e., 10%, 20%, 30%, etc.).

that the MEB recommended plaintiff's referral to an informal PEB, *see* AR at 194, plaintiff was instead returned to duty.[4]  *Id.* at 170.

On November 5, 2007, plaintiff suffered speech dysarthria,[5] as well as an acute onset of numbness and weakness in his left arm, left leg, and the left side of his face.  *Id.* at 180.  According to the Medical Board Narrative Summary, plaintiff stated that the weakness was profound and that he could not lift his arm.  *Id.*  The narrative summary also reports that plaintiff stated this episode of numbness and weakness lasted twenty seconds but was followed four hours later by another short episode of left leg weakness.  *Id.*  Plaintiff sought treatment at the emergency room, where he was diagnosed with a stenosis of his intracranial vasculature[6] and began treatment with Coumadin, an anticoagulant.  *Id*

According to medical records, by July 28, 2008, plaintiff was being treated for hypertension, hyperlipidemia, vitamin B12 deficiency, and transient ischemic attack ("TIA"), a kind of minor stroke.[7]  *Id.* at 189.  Plaintiff's deteriorating health led to a second MEB on September 3, 2008.  *See id.* at 174.  The MEB diagnosed plaintiff with diabetes mellitus, hypertension, TIA, and hyperlipidemia, all of which plaintiff incurred while in the Air Force.  *Id.*  The MEB recommended plaintiff's referral to an informal physical evaluation board.  *Id.*  This time, plaintiff submitted a letter to Headquarters, Air Force Personnel Command, in which he stated his disagreement with the MEB's recommendation and his desire to continue to serve as a dentist in the Air Force.  *Id.* at 177.

Despite plaintiff's disagreement, his case was referred to an informal physical evaluation board.  *See id.* at 170.  After reviewing the record, the informal PEB found that only plaintiff's stenosis rendered him unfit and was compensable and ratable for disability purposes.  *Id.*  The informal PEB recommended a 10 percent disability rating.  *Id.*  It also determined that plaintiff's diabetes mellitus, hypertension, and history of transient ischemic attack were conditions that could potentially render plaintiff unfit, but were not presently compensable or ratable.  *Id.*  Finally, the informal PEB determined that plaintiff's hyperlipidemia did not render plaintiff unfit and was therefore not compensable or ratable.  *Id*.  Plaintiff disagreed with the recommendation and requested a hearing before a formal PEB.  *Id.* at 167.

---

[4] Neither the administrative record nor the parties provide any explanation for why the MEB's recommendation was not followed.  Nor does it matter, as plaintiff's diabetes mellitus was also noted by plaintiff's second MEB.

[5] Dysarthria is a speech disorder consisting of imperfect articulation due to the loss of muscular control after damage to the central or peripheral nervous system.  *Dorland's Illustrated Medical Dictionary* 575 (32d ed. 2012).

[6] Stenosis is an abnormal narrowing of a duct or canal.  *Dorland's Illustrated Medical Dictionary* 1769 (32d ed. 2012).

[7] Ischemia is a deficiency of blood in some body part, usually due to functional constriction or actual obstruction of a blood vessel.  *Dorland's Illustrated Medical Dictionary* 961 (32d ed. 2012).

Rather than maintaining his original contention that he was fit to remain in the Air Force as a dentist, plaintiff completely reversed his position before the formal physical evaluation board. On a form labeled "Contention Slip" submitted to the formal PEB, plaintiff requested that he be found unfit for service and retired with a 100 percent disability rating. *Id.* at 46. Specifically, plaintiff requested a 40 percent rating for stenosis of intracranial vasculature under the rating schedule codes 7799-7704[8] due to "continuous requirements of phlebotomy visits, every two weeks."[9] *Id.* He also requested his transient ischemic attack be rated at 100 percent under code 8008 due to the fact that the issue was not resolved because of "continuous change in myelosuppressant therapy." *Id.*

The formal PEB issued its findings and recommendations on February 20, 2009. *Id.* at 41. Although the formal PEB agreed with the informal PEB's recommendation of a 10 percent disability rating, it differed slightly in its diagnosis. *See id.* The one condition it found to be compensable and ratable was "Severe Stenosis of Intracranial Vasculature, stat-post TIA, requiring lifelong Anticoagulation with Coumadin" under diagnostic code 8008-7704. *Id.* The formal PEB rated plaintiff's stenosis under the ratings schedule code 8008, "Brain, vessels, Thrombosis of,"[10] noting that it had been more than six months since plaintiff had experienced the transient ischemic attack. *Id.* The rating schedule calls for a rating between 10 and 100 percent for code 8008 based on the degree of "impairment of motor, sensory, or mental function." 38 C.F.R. § 4.124a.

Plaintiff's residual condition was rated under code 7704, which, as described above, covers polycythemia vera, *see supra* note 8, and provides for a rating of 40 percent when the individual must undergo phlebotomy—that is, the drawing of blood. Although plaintiff did require recurrent phlebotomy, the formal PEB noted that this was not a form of treatment, but was instead done for the purpose of monitoring the progress of plaintiff's prescribed anticoagulation—his blood thinning. *See* AR at 42. The formal PEB agreed with the informal PEB's findings that plaintiff's hypertension and diabetes mellitus were not compensable or ratable and that his hyperlipidemia did not make him unfit for military service. *Id.* at 41. The formal PEB informed plaintiff of its recommendation on February 20, 2009, and plaintiff

---

[8] The use of a hyphen indicates a rating based on residual conditions. As explained in the rating schedule, "[w]ith diseases, preference is to be given to the number assigned to the disease itself; if the rating is determined on the basis of residual conditions, the number appropriate to the residual condition will be added, preceded by a hyphen." 38 C.F.R. § 4.27. Code 7704 covers polycythemia vera, a myeloproliferative disorder characterized by abnormal proliferation of all hematopoietic bone marrow elements and an absolute increase in red cell mass and total blood volume. *Dorland's Illustrated Medical Dictionary* 1488 (32d ed. 2012).

[9] Phlebotomy is the incision or needle puncture of a vein for the purpose of drawing blood. *Dorland's Illustrated Medical Dictionary* 1434 (32d ed. 2012). When an individual rated under code 7704 requires phlebotomy, the required rating is 40 percent. *See* 38 C.F.R. § 4.27.

[10] Thrombosis is the formation, development, or presence of a thrombus, that is, a stationary blood clot along the wall of a blood vessel, frequently causing vascular obstruction. *Dorland's Illustrated Medical Dictionary* 1923 (32d ed. 2012).

requested that his case be referred to the Secretary of the Air Force Personnel Council for the final stage of the disability evaluation review process. *Id.* at 20.

On March 6, 2009 plaintiff submitted a letter, addressed to the PEB, supplementing his request for review by the Secretary of the Air Force Personnel Council. *Id.* at 26–35. In this letter, plaintiff asserted that the recommendation by the formal PEB was arbitrary and capricious because it made conclusions without proper medical evidence. *Id.* at 27. Plaintiff requested that his case be returned "to the MEB for complete medical analysis based on the additional conditions cited in this Appeal" or, in the alternative, order that plaintiff be retired with the highest disability rating. *Id.*

In his letter, plaintiff objected specifically to the formal PEB's 10 percent disability rating for stenosis, citing the fact that he has "extreme stenosis with 80% blockage," presumably meaning blockage of his intracranial vasculature. *Id.* at 29. And plaintiff noted that a disability rating as high as 100 percent is possible for stenosis and requested "an appropriate medium" between 10 percent and 100 percent. *Id.* In addition, plaintiff stated that the formal PEB did not develop the medical record for his hypertension and diabetes, even though he was found to have these conditions. *Id.* at 29–30. This failure, plaintiff argued, made it impossible for the formal PEB to evaluate plaintiff's unfitness fairly.

Finally, plaintiff cited a myriad of other conditions and symptoms that he believed should have been further investigated. These were:

- Mental illness
- Tingling sensation and numbness in fingertips
- Nausea
- Dizziness
- Light headiness
- Stomach pain
- Inability to eat without have stomach pain
- Indigestion
- International normalized ratio of 1.9 on February 12, 2009
- Nose bleeding in the morning
- Blood clots when blowing nose
- Easy bruising
- Severe headaches
- Shortness of breath
- Sleep apnea
- Gasping for air at night or swallowing on the wrong pipe while sleeping
- Snoring
- Insomnia
- Persistent tiredness or lack of energy
- Confusion
- Lack of ability to concentrate
- Vision changes
- Unusual thirst

- Waking up to urinate three or more times a night
- Decreased sexual ability
- Inability to maintain an erection once achieved
- Diarrhea
- Bloatedness
- Drowsiness
- Night sweats
- Tennis elbow
- Back pain
- Right shoulder pain
- Neck pain
- Flatulence
- Hair loss
- Dry skin
- Shaky hands
- Feeling heavy

*Id.* at 30-31.

Attached to plaintiff's letter was a mental health record dated March 4, 2009. The record shows that plaintiff visited the Mental Health Clinic at Edwards Air Force Base complaining of loneliness, social isolation, and suicidal ideation. *Id.* at 34-35. The records further shows that the assessment was the psychological condition adjustment disorder with anxiety and depressed mood, ruling out depression not otherwise specified and ruling out social phobia and anxiety not otherwise specified. *Id.* at 34-35.

Thereafter, on March 8, 2009, plaintiff submitted a one-page outpatient record for Neurological Services, UCLA Healthcare. The outpatient records were electronically signed by Latisha Ali, M.D., who recommended that plaintiff continue "lifelong" anticoagulation unless he becomes symptomatic, in which case plaintiff should seek emergent medical attention for possible endovascular intervention. *Id.* at 22-26.

On April 6, 2009, the Secretary of the Air Force Personnel Council directed that plaintiff be separated (that is, discharged) from the Air Force under 10 U.S.C. § 1203 and receive severance pay with a disability rating of 10 percent. AR at 6. The Secretary rated plaintiff's stenosis using code 8046 for "Cerebral arteriosclerosis,"[11] noting that plaintiff "did not suffer a thrombosis or cerebral infarct." *Id.* at 7. However, the Secretary determined that the 10 percent rating would be appropriate using either code 8046 or code 8008. *Id.* at 7. As for plaintiff's other contentions, the Secretary found that many or most of the other alleged conditions either existed prior to service or did not warrant referral to a new MEB. *Id.* at 7.

---

[11] According to the rating schedule, a rating under code 8046 may not exceed 10 percent based on "[p]urely subjective complaints, such as headache, dizziness, tinnitus, insomnia and irritability." 38 C.F.R. § 4.124a.

Plaintiff was honorably discharged from the Air Force on May 29, 2009. *Id.* at 1. He then filed this action on November 2, 2010. Plaintiff's complaint is a repetition of the allegations found in his letter to the Secretary. *Compare* Compl. ¶¶ 17–20 *with* AR at 29–31. Accordingly, plaintiff asks this court to find that the Air Force's disability determination was arbitrary and capricious, order a new MEB, and award him monetary damages. Compl. ¶¶ 31–34. In what plaintiff styles as an alternative, he asks this court to order him retired with a rating consistent with the new examination disability findings." *Id.* ¶ 35.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction in the Court of Federal Claims essentially springs from the Tucker Act, which empowers the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). The Tucker Act waives the government's sovereign immunity, but it does not serve as a money-mandating source of substantive law giving rise to a claim. *United States v. Testan*, 424 U.S. 392, 398 (1976); *Ferreiro v. United States*, 501 F.3d 1349, 1351 (Fed. Cir. 2007) (citing *Testan*, 424 U.S. at 398); *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). Rather, plaintiff must establish an independent right to monetary damages based upon a money-mandating source within a contract, regulation, statute, or constitutional provision. *Testan*, 424 U.S. at 400; *Tippett v. United States*, 185 F.3d 1250, 1254 (Fed. Cir. 1999) (quoting *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998), *reh'g denied* (1999)).

Service members bringing claims for pay or benefits owed to them typically cite one of two money-mandating statutes:  the Military Pay Act,[12] or 10 U.S.C. § 1201.[13] Unlike the Military Pay Act, which entitles an enlisted active-duty service member to basic pay for the member's designated pay grade, § 1201 entitles such a member to disability pay upon a finding by the service branch secretary that the service member is unfit. As explained above, the calculation of disability pay depends on whether the service member is "retired" under § 1201 or "separated" under § 1203. Generally, a service member found unfit with a disability rating of at least 30 percent is eligible for retirement with "retired pay" calculated under 10 U.S.C. § 1401, whereas a member with a disability rating less than thirty percent is eligible only for separation with "severance pay" calculated under 10 U.S.C. § 1212.

Plaintiff mischaracterizes his claim as being for "wrongful discharge" under the Military Pay Act. Compl. ¶¶ 2, 23. The alleged wrong for which plaintiff seeks redress is an

---

[12] 37 U.S.C. § 204.

[13] The distinction between the Military Pay Act and 10 U.S.C. § 1201 is most pronounced in terms of when a claim under each accrues. Whereas a claim for wrongful discharge under the Military Pay Act accrues immediately upon separation, *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2005) (en banc), a claim for disability pay accrues only after a competent administrative board has acted. *Chambers v. United States*, 417 F.3d 1218, 1224-25 (Fed. Cir. 2005) (citing *Friedman v. United States*, 159 Ct.Cl. 1, 310 F.2d 381, 396 (1962)). Here, plaintiff's claim has accrued under either statute because he has been separated and has had his case decided by the formal PEB and the Personnel Council.

insufficiently high disability rating, Compl. ¶¶ 21-30, and the relief plaintiff requests is aimed at increasing that rating so that the member can be "retired" under § 1201, rather than "separated" under § 1203. Compl. ¶¶ 31-37. The court therefore construes plaintiff's claim as arising under 10 U.S.C. § 1201, rather than the Military Pay Act. *See Fulbright v. United States*, 97 Fed. Cl. 221, 229-31 (2011) (characterizing a plaintiff's claim as being for disability pay under 10 U.S.C. § 1201 even though the complaint asserted the Military Pay Act as the money-mandating statute).[14]

Having established the basis for this court's jurisdiction, the court now turns to the standards governing its review of the Air Force's decision to separate plaintiff with a disability rating of 10 percent. In ruling on cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike in the context of a motion for summary judgment, the existence of genuine issues of material fact neither precludes a grant of judgment on the administrative record nor requires evidentiary proceedings. *Johnson v. United States*, 97 Fed. Cl. 267, 270 (2011). Instead, the resolution of cross-motions under RCFC 52.1 is "akin to an expedited trial on the paper record." *L-3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 (2008) (citing *Bannum*, 404 F.3d at 1356).

It is beyond question that determining who is fit to serve in the armed forces is not the responsibility of the judiciary. *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983). That task is assigned instead to the military, whose administrators (like all public officials) are presumed to have properly discharged their duties in the absence of clear evidence to the contrary. *See Sickels v. Shinseki*, 643 F.3d 1362, 1366 (Fed. Cir. 2011); *Johnson*, 97 Fed. Cl. at 270. Accordingly, this court will set aside the Air Force's determination only if plaintiff shows, "by 'cogent and clearly convincing evidence,'" *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (quoting *Dorl v. United States*, 200 Ct.Cl. 626, 633, *cert. denied*, 414 U.S. 1032 (1973)), that the Air Force's decision was arbitrary, capricious, or not supported by substantial evidence. *Haskins v. United States*, 51 Fed. Cl. 818, 824-25 (2002) (citing *Heisig*, 719 F.2d at 1156)). Thus, this court does not sit as "a super correction board," *Skinner v. United States*, 219 Ct.Cl. 322, 594 F.2d 824, 830 (1979), but instead reviews the Air Force's decision with substantial deference. *Chapman v. United States*, 92 Fed. Cl. 570, 577 (2010) (citing *Van Cleve v. United States*, 70 Fed. Cl. 674, 678 (2006); *see also Pope v. United States*, 16 Cl.Ct., 637, 641 (1989) ("When substantial evidence supports a board's action, and when that action is reasonable in light of all the evidence presented, the court will not disturb the result.").

Accordingly, this court's review "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig*, 719 F.2d at 1157 (emphasis in original). "Substantial evidence" is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* To show that the military acted arbitrarily, capriciously, or without the support of substantial evidence, a

---

[14] To the extent plaintiff also relies upon the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA"), as a money-mandating statute, this is incorrect. Because actions authorized by the APA are limited to those for relief "other than money damages," the APA is not money-mandating. *Fulbright*, 97 Fed. Cl. at 227 (citing *Martinez*, 333 F.3d at 1313).

plaintiff "must demonstrate that evidence was ignored or unreasonably construed." *Haskins*, 51 Fed. Cl. at 828 (citing *Thomas v. United States*, 47 Fed. Cl. 560, 569 (2000)).  Thus, plaintiff's burden, although not necessarily insurmountable, is heavy indeed.

## DISCUSSION

Applying these standards here, the court must sustain the Air Force's decision to separate plaintiff with a 10 percent disability rating.  The administrative record contains ample support for that decision, and plaintiff has failed to meet the burden to show that the Air Force's decision was arbitrary, capricious, or not supported by substantial evidence.

Plaintiff's primary argument is that the Air Force "acted arbitrarily and capriciously by failing to fully consider or develop the medical record before them, or to obtain a complete medical record, such that they could fairly determine [p]laintiff's disability rating."  Pl.'s Opp. and Mot. at 5.  Specifically, plaintiff alleges that "based on [p]laintiff's medical history, his self-reported ailments, and his potential psychological issues, [the Air Force] should have instituted a new MEB to fully develop these issues."  *Id.*  Plaintiff also argues that the Air Force evaluated his condition without substantial evidence, and that in order to acquire substantial evidence the Air Force should have convened a new MEB.

The argument is meritless.  Although the Air Force's explanation for reaching a final decision without ordering a new MEB could have been more specific, it is not arbitrary, capricious, or unsupported by substantial evidence.  As the deputy director of the Personnel Council explained in the memorandum directing plaintiff's discharge, the Personnel Board conducted "a review of all facts and evidence . . . includ[ing] testimony presented before the [formal PEB], the remarks by the [formal PEB], the remarks by the [informal PEB], the service medical record, and the narrative summary of the [MEB]."  AR at 6.  The Air Force noted plaintiff's request for new MEB and gave a full explanation for denying that request.  AR at 7.

First, the Air Force found no evidence suggesting that conditions reported to the September 2007 MEB had worsened to the point of requiring further examination.  AR at 7.  Second, the Air Force correctly determined that plaintiff's adjustment disorder is not eligible for disability consideration.  AR at 7; DoDI 1332.38, E4.13.1.4.  Third, the Air Force found no evidence that plaintiff suffered from sleep apnea.  AR at 7.  Fourth, the Air Force found no evidence in the medical records suggesting that plaintiff was unfit due to his other self-reported conditions and symptoms.  AR at 7.  Finally, the Air Force noted, correctly, that mere symptoms (a category that includes most of what plaintiff reports) are not physical disabilities.  AR at 7; DoDI 1332.38, E2.1.25.

In arguing that the Air Force acted irrationally—that is, arbitrarily, capriciously, and without substantial evidentiary support—plaintiff fails to cite to a single piece of evidence that the Air Force "ignored or unreasonably construed."  *See Haskins*, 51 Fed. Cl. at 828.  Instead, plaintiff argues that the *lack* of evidence concerning various symptoms and conditions should have prompted the Air Force to convene a new MEB.  Pl.'s Opp. and Mot. at 5-6.  Although Air Force regulations give the Secretary of the Air Force Personnel Council the *option* of ordering a new MEB, *see* AFI 36-3212 ¶ 5.9, plaintiff cites no case in support of the proposition that Secretary *must* do so.  Common sense dictates that the Air Force cannot be required to institute a

new MEB to explore the mere *possibility* that conditions a member purports to have are unfitting. Indeed, such a requirement would be in itself irrational.

To be sure, plaintiff's argument comes very close to the argument the then-Claims Court rejected in *Candelaria v. United States*, 5 Cl.Ct. 266 (1984).  There, the plaintiff argued that the Air Force denied him the "full and fair hearing" before the PEB which the plaintiff claimed to be entitled to under 10 U.S.C. § 1214.  *Candelaria*, 5 Cl.Ct. at 271-72.  Although the plaintiff "made no allegation that the Correction Board acted arbitrarily and capriciously by disregarding evidence in the record before it," the plaintiff did assert that the Correction Board violated a "duty to obtain further information if it appears that the facts have not been fully and fairly disclosed." *Id.* at 273-74.

The court agreed that such a duty existed, but held that the Correction Board had not violated it.  *Id.*  The court ascribed particular importance to the fact that the plaintiff "chose not to bring forward any new or relevant evidence whatsoever to show to the Correction Board that his myocardial infarction was in fact a service-related injury instead of a disease," despite having the opportunity to do so.  *Id.* at 274.  In the court's view, although the Air Force would have had a duty to investigate any evidence the plaintiff had presented, it had no duty to embark on a search for evidence when the plaintiff had failed to present *any* of his own.  *Id.* ("The plaintiff cannot demand another forum be made available to him before his will present his evidence. The Correction Board was the forum plaintiff was in, *and in which he had the burden to present evidence to support his disability claim*.") (emphasis added).

Although this case does not implicate § 1214, *Candelaria*'s reasoning with respect to the Air Force's "duty to obtain further information" certainly applies.  Plaintiff had the opportunity to submit evidence to the formal PEB and to the Secretary of the Air Force Personnel Council. The Air Force considered the evidence plaintiff did submit as to his stenosis and adjustment disorder, but it was not required to hunt for additional conditions rendering plaintiff unfit where the evidence before it did not indicate the existence of such conditions.  Because plaintiff has not pointed to any evidence the Air Force "ignored or unreasonably construed," the court concludes that the Air Force did not act arbitrarily, capriciously, or without substantial evidentiary support in declining to institute a new MEB.

Finally, in addition to his disagreement with the Air Force's decision not to institute a new MEB, plaintiff argues that the decision to rate plaintiff's stenosis at 10 percent was also arbitrary, capricious, and not supported by substantial evidence.  Pl's Opp. and Mot. at 4-5, 6-7. This argument is also meritless.  The deputy director of the Personnel Council provided a reasoned, evidence-based explanation for rating plaintiff's stenosis at 10 percent:

> The [Personnel] Board considered the member's contention for using code 8008 for "Brain, vessels, thrombosis of" as well as 8046 for "Cerebral arteriosclerosis."  As the member did not suffer a thrombosis or cerebral infarct, the Board determined that the member's cerebral stenosis was more appropriately rated as cerebral arteriosclerosis.  The member has no permanent objective neurologic deficits.  Under this code, "purely subjective complaints such as headache, dizziness, tinnitus, insomnia and irritability", many of which the member self-reports, are maximally rated

at 10 percent.  Either code chosen would generate a maximum rating of 10 percent in this case.

AR at 7.  Plaintiff does not mention, let along refute, this analysis, but instead asserts that the decision to rate plaintiff's stenosis at 10 percent is "in conflict" with the decision to find that plaintiff met the "high" standard for unfitness.  This is incorrect.  Ratings are assigned only after a member has been found to be unfit.  AFI 36-3212, ¶¶ 1.7, 1.9; DoDI 1332.39, ¶¶ 4.1, 6.1.1.  It follows from this that if a 10 percent disability rating were "in conflict" with a finding of unfitness, there would be no such thing as a 10 percent disability rating.  Plaintiff's argument fails to consider that the standard for unfitness and the ratings system applied to unfitting conditions measure different things.

As defendant rightly explains, "[the 'high' standard for unfitness] relates to the quantity and quality of evidence available to show the fact of unfitness, and [the rating] goes to degree." Def.'s Opp. at 2; *see also* DoDI 1339.39, ¶ 6.1.1 ("Once a Service member is determined to be physically unfit for further Military Service, [the] ratings are applied to the unfitting condition(s).  Percentages are based on the severity of the condition(s).").  Plaintiff's mere disagreement with the Air Force's assessment of the degree of plaintiff's unfitness is insufficient to meet the burden of showing that the Air Force's rating was arbitrary, capricious, or not supported by substantial evidence.

## CONCLUSION

In short, plaintiff points to no evidence "ignored or unreasonably construed" by the Air Force and fails to refute any of the Air Force's reasoning.  In light of the heavy burden on plaintiff to overcome the presumption of regularity and prove that the Air Force's decision to separate plaintiff with a disability rating of 10 percent was arbitrary, capricious, or not supported by substantial evidence, defendant's MOTION for judgment on the administrative record is GRANTED and plaintiff's MOTION for judgment on the administrative record is DENIED. The Clerk is hereby directed to take the necessary steps to dismiss this matter.

IT IS SO ORDERED.

s/Lawrence J. Block

Lawrence J. Block
Judge

**Appendix**

On April 11, 2011, this court issued a protective order guarding, among other things, the confidentiality of the parties' personal medical information. Protective Order; RCFC 5.2(d) ("The court may order that a filing be made under seal without redaction."). The court delivered its opinion under seal on January 9, 2012. Opinion and Order, No. 10-751 C. On January 24, 2012, pursuant to RCFC 2(d), the court afforded the parties an opportunity to propose redactions to the published opinion. Plaintiff proposed extensive redactions concerning medical information in the opinion. For the reasons set forth below, the court reissues the opinion, unsealed, without redactions.

There is a "presumption of public access to judicial records." *Baystate Techs., Inc. v. Bowers*, 283 Fed. Appx. 808, 810 (Fed. Cir. 2008) (citing *Siedle v. Putnam Invs., Inc.,* 147 F.3d 7, 9 (1st Cir. 1998). "[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 (1978) (assuming that the "common-law right of [public] access" applied to the tape recordings in that case); *see also Bowers*, 283 Fed. Appx. at 810 (quoting *Siedle*, 147 F.3d at 9-10) ("[P]ublic monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system."). Part of the rationale for allowing public access to judicial records is that the public has an interest in ensuring that the law is fairly and coherently developed "so that all claimants can have notice of the standards for judging a case." *Castagna v. Sec'y of Health and Human Servs.*, 2011 WL 4348135, *14 (Fed. Cl. Aug. 25, 2011); *see also Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (Without access to judicial opinions "the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.").

Although not absolute, the public's interest in inspecting judicial records "extends . . . to materials on which a court relies in determining the litigants' substantive rights." *FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 408 (1st Cir. 1987) (internal quotations and citation omitted); *see also Nixon*, 435 U.S. at 589. To determine whether records should remain sealed, "the court must balance the privacy interests of the parties against the public interest in access to the . . . information." *Akal Sec., Inc. v. United States,* 87 Fed. Cl. 311, 314 n. 1 (2009) (quoting *Bowers*, 283 Fed. Appx. at 810); *see also Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 132 (2010) ("Accordingly, in deciding which, if any, of defendant's proposed redactions are appropriate, the court must balance the public interest in access against any putative private interest in maintaining the confidentiality of the information in question."); *Planetspace, Inc. v. United States*, 92 Fed. Cl. 520, 520 n.* (2010) (confidentiality interests weighed in favor of accepting some but not all of proposed redactions).

The court recognizes that redaction of personal medical information may be appropriate in some cases where specific circumstances make the argument for privacy particularly strong. However, were the court to redact all references to specific symptoms or conditions, treatments, and ratings schedule codes, it would deprive public of any means of understanding how the law was applied in this case. Plaintiff's desire to keep his medical information private, while understandable, is ordinarily not enough to overcome the presumption of access to judicial records where that information is necessary for the public to understand the case. *Baxter Intern., Inc. v. Abbot Laboratories*, 297 F.3d 544, 547 (7th Cir. 2002) ("[M]any litigants would like to

keep confidential the salary they make, the injuries they suffered, or the price they agreed to pay under a contract, but when these things are vital to claims made in litigation they must be revealed."); *see also Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) ("The mere fact that the production of records may lead to a litigant's embarrassment . . . will not, without more, compel the court to seal its records."); *c.f. Langland ex. rel. M.L. v. Sec'y of Health and Human Servs.*, 2011 WL 802695, *8 (Fed. Cl. Feb. 3, 2011) ("Redaction of all medical information concerning petitioners who seek compensation under the Vaccine Program would render special masters' decisions meaningless," and therefore such relevant information should be disclosed "[a]bsent particularized grounds warranting non-disclosure.").  In short, the mere fact that plaintiff desires privacy regarding his personal medical information is not reason enough to conceal the information that the court considered in reaching its decision.

Accordingly, the opinion is reissued without redactions.